Miami Gardens v. Wells Fargo & Co. Good morning, Mr. Peck. Good morning, Your Honor. May it please the Court. My name is Robert Peck. I'm here on behalf of the City of Miami Gardens. This is a continuing violations case under the Fair Housing Act. What the continuing violations doctrine does... Tell you what you better address for me is standing. I'm sorry? You better address for me standing. I think it's wrapped up in this. It allows the plaintiff to meld past claims with a current claim into a single timely claim. So not to preempt Judge Pryor's question, but I suspect it's headed in the same direction. You say past claims with current claims. And by claims, you mean actual violations within the discriminatory practices that violate the Act. That violate the Act. So you have to have a freestanding... We all agree, then, that you have to have a freestanding violation within the statute of limitations period before you can... At least one. Okay, good. All right, good progress. Okay, so I didn't realize that we were on common ground there. Yes. So it's not just some sort of vague allegation of something suspicious within the statutory period, but an actual, honest to goodness, violation. Well, the thing is, it's not a full violation. What you have to do is show that your claims from the past, so the ones that would be considered otherwise untimely, are of the same kind of injury and the same type of prohibited action that the FHA addresses. Maybe this is just all semantics, but by prohibited action, I take you to mean something that violates the Act. And what I'm saying is it's a discriminatory practice. That's all we think we need to do. We do not need to completely litigate the full-fledged violation. There's no mini-trial of that violation that has to trigger the right to try the whole case. So what is a discriminatory practice? It doesn't necessarily itself violate the Act, but may sort of open up the door to lots of... And Havens addresses this, because it says that when you address the statute of limitations, you don't look at isolated instances, but you look at the continuous practice. And so it is the practice that is the violation. The practice becomes clear that it is a violation only when you look at it over the time. And so therefore, that's why Havens talks about a single instance of the same misbehavior is enough to allow you to try the whole case. Otherwise, what you're doing is you're basically creating the isolated case as a separate trial in order to get to the case you actually pleaded. So that's... Where is there any evidence that a plaintiff suffered an actual or was about to suffer an imminent harm that would establish standing? First of all, this was a partial summary judgment action based on the statute of limitations. For purposes of statute of limitations, you only have to show when the action accrued, not when the injury occurred. But they moved for summary judgment on standing as well. And the district court didn't grant it. And the district court, in my view, should have considered justiciability first. The issue of standing that was raised was the issue that was settled by the United States Supreme Court. Allegations are one thing. Evidence is something else. You have to always establish standing. You can allege it, but then you have to prove it, too. Standing never goes away. I agree with that. But at the same time, the district court limited our discovery and only accepted evidence that had to do with the loans within the limitations period. But if you wanted to look at injury, our operative complaint, the third amended complaint, has attached to it Exhibit A. Exhibit A lists 10 loans from prior to the limitations period that had gone to foreclosure and lists the year-by-year continued diminishment of the property taxes that the city received from that property. And what it demonstrates is even after the house was resold after foreclosure or taken over by the bank because they could not sell it, it continued to diminish and never recovered its full value. That is the injury, which this court recently in the city of Miami case recognized as a proper proximate cause of the claims that we make here. And so that injury is inevitable. That's everything you're relying on, is that Exhibit A? Exhibit A does that, but at the same time, the report of our expert. That's actual injury here. That's actual injury, but also the report of our expert notes that one of the two loans that we used in our matched pairs had already started to have problems, that there was delinquencies in that loan, and that was a precursor to foreclosure. That's pretty speculative. It seems to me in terms of an imminent injury. Well, again- Had problems. If you- We don't know whether it would have foreclosed. We don't know what the effect would have been on property. I mean, values, I mean, that's pretty remote, it seems to me. According to our expert, that is a signal that it is headed towards foreclosure. But that's enough to show some imminency. And if the court had not made the error of bifurcating discovery and also not permitting any discovery beforehand, in contrast to the case in Philadelphia against Wells Fargo, the case in Oakland against Wells Fargo, and Miami Gardens' case against Citigroup, where the judge allowed two years before the limitations period began, you could then see the pattern and you could say that it's not speculative. That it is indeed imminent and it is a regular occurrence. So I think that, again, the bifurcation in this restricted manner is essentially what prevented this kind of thing. Now, because the district court was not inquiring into standing, that was not put into issue, and there was no reason to try to muster this evidence, but this evidence exists in the record. And as I said, if you simply look at Exhibit A, which is evidence, it shows that these homes had begun to diminish in value, that the property taxes they paid diminished and the city suffered as a result. So I think that that's sufficient to establish standing. This is an injury in fact that goes precisely to the allegations that we made, and there was no contrary evidence to that. If I can then turn to the matched pair evidence, the court made the error of trying to say that that really had to show statistical imbalance. But of course, if your obligation is only to show one loan that matched the criteria that you use for showing your continuing violation, then there's no way that you're going to show statistic imbalance. Instead, both sets of experts used the same matched pair criteria, which is valid for this purpose. The thing is that the judge said that it had to be nearly identical using a Boykin standard that this court has now rejected in the Lewis case. At the same time, what he said was, well, it's obvious that the lending credits that were not revealed to us in discovery but was revealed to us through the expert report that they pushed made all the difference. But there was no criteria for how that lending credit calculates into the loan. Even on rebuttal, there was no evidence, no data that shows that this was a proper calculation, and as our expert rebuttal report demonstrated, that everything that they said still doesn't explain the difference, and that the only logical explanation, the only thing that a Russian analysis would show as the appropriate difference between the loans of these two matched pairs was a consideration of race. I guess you don't dispute, as a matter of fact, for purposes of applying the real standard now, the Lewis standard, the fact that two of the borrowers got lender credits, whereas the white borrower did not. The two did not receive the promotional pricing that the white lender sort of lucked into, it looks like to me, by virtue of the period when he asked for the loan. And what essentially Wells Fargo has asked us to do is accept the ipsy dixit of their expert, that this is enough to explain the difference when our expert running through what is logically, as an economist, the kind of credit that that might mean doesn't explain the difference. And when you take that into account, the minority borrower paid a higher price. But I guess in Lewis, for instance, in Lewis we formulated a new standard. We reject nearly identical. We formulated a new standard, and then we took the facts before us and applied them. As to whether or not these two were similarly situated in all material respects, we said no, and there was a dispute among the judges on the court. But no one said, whoa, we need expert testimony or sort of new facts to determine whether or not these two comparators are in fact valid comparators. We just sort of took the facts that were before us and applied them. How is this different? Well, because we do have the expert evidence here, and the expert evidence shows that for all material aspects of analysis, there is a similarity that satisfies that Lewis standard. In the absence of expert evidence, I could see how it's possible to say that we don't have enough financial information. But here we do have enough to show that the material differences are nonexistent. Thank you. Thank you, Mr. Hancock. Mr. Hancock, may I ask you a question just before you get started? Sure. I think you referred in your brief – I stopped counting, I think, at 8 – but to Mr. Peck as a contingent fee lawyer. What inference am I to draw about the merits of his claim from the fact that he has this case on a contingent fee basis? Well, the fact that it's contingent – I mean, of course, government lawyers can't have a financial stake in the outcome of the litigation. We don't mean to demean them for that. It felt like an epithet. It read like an epithet. I think it explained – it helps understand why the city doesn't have any information of a violation of the Fair Housing Act. I mean, if you look at the undisputed facts, the city 30B6 witness didn't know anything about a violation of the Fair Housing Act. The city community development director was unable to identify any injury to the city. Those are all decent arguments on the merits, I think. I don't quite understand how Mr. Peck's fee arrangement affects them. I don't take it any further. I'm not claiming it does. I think that's the right call. So let me start with – I'm going to talk about the standing issue, and I'm tying that with the language of the statute itself. You asked what they have to do here. They have to show an action of a violation of the Fair Housing Act within the period of the statute of limitations. That's what any plaintiff's burden is in coming into a court. That's what Congress establishes the time period which claims have to be brought. They have to show an action of a violation. So what does that mean in this context? Well, the Fair Housing Act 3613 is a provision that they use in this case, and the claim – and that allows an aggrieved person to bring a claim within two years of the occurrence or termination of a discriminatory housing practice. What do those words mean? Section 3602 of the Act is the definition section that defines those terms. An aggrieved person is defined as a person who claims to be injured by a discriminatory housing practice or believes that the person will be injured by a discriminatory housing practice that's about to occur. So 3613 encompasses injury because you have to be an aggrieved person, and to be an aggrieved person you have to claim injury. So what does discriminatory housing practice mean? That's one of the things that Mr. Peck keeps talking about here, and that's also defined in the statute. In 3602 – let me make sure I'm getting the right subsection – 3602I is the aggrieved person definition. 3602F describes discriminatory housing practice to mean an act, an act that violates one of the provisions of the law. So the word practice in that context is not used to emphasize continuing conduct. A plaintiff has no burden to coming into court to show that this is some practice that continues and continues. They just have to show an act of discrimination. That's what the word means. On this record, the city didn't put any evidence of injury before the court. There's absolutely no evidence of injury. What about exhibit A, 10 foreclosures? Well, two things. One, that wasn't put in evidence. That's an allegation of the complaint. And secondly, we're talking about traceability here, Judge Pryor, and traceability in this context does not mean a trace, a link between a foreclosure and a reduction in property values. It means a link between discrimination and a reduction in property values. Borrowers default on their loans for many reasons. And the city doesn't purport to have any information. It didn't present any evidence in the court as to why borrowers might. Any evidence of the effect of those 10 loans on the property tax revenues or municipal spending of the city? I'm sorry. Was there any evidence? No. Okay. No, there was no evidence. And there's no evidence that any of those borrowers defaulted because of discrimination. There's none. And borrowers obviously default for a number of reasons. The city, in the undisputed facts, the undisputed facts are in the record in Document 100. I'll cite them by the paragraph number of the fact. The city stipulated, it's undisputed that the city had received no complaints from borrowers, and that's undisputed fact number 14. The city conceded to the district court at a hearing on December 23, 2014, the transcript is Document 29, that they didn't talk to any borrowers before filing this lawsuit. Even though they identified properties by address, which obviously can easily be reverse engineered to identify specific people. They didn't talk to those people. They didn't have their permission to put their financial circumstances at issue. They don't purport to know anything about why any borrower might have defaulted on his loan. Mr. Peck talked about one of the borrowers, HC2, as being late on his payments a couple of times. But he doesn't know why they're late on the payments. There's nothing, if they're going to say that as an injury that's traceable, discriminatory loan, late payment would have to be because of some discriminatory term. And also, we talk about eminence there. The undisputed facts in the record show that that loan to HC2, during the time period after the loan was originated, the property values of that house increased by more than 50%. Increased by more than almost $62,000. Now what that means is that it makes it much less likely that there are other difficulties around that property because if the borrower does have financial difficulties, they can sell their home and walk away with a pocket of cash. So there's no suggestion that anything was imminent here. The city's lack of injury here is its own choosing. It decided that it didn't have to present evidence of injury. It wasn't going to present evidence of injury. It did not present evidence of injury. This is not anything that can be tied to discovery problems. Evidence of injury is in the domain of the city. Wells Fargo doesn't have information of how the city might have been harmed by alleged loan. The city said in paragraph 65 of its complaint that its injury could be shown by readily available property tax records. They could easily ascertain its injury by using readily available property tax records. But when it came to the time for presenting proof, they didn't present any proof of any injury, even though they have it in their pocket. Mr. Peck talked about the comparators here, and certainly we agree that the Lewis decision now guides this resolution. But that requires that they be similar in all material respects, and they aren't. As you said, Judge Newsom, two of the borrowers had lender credits and the other didn't. Lender credits are really important provisions that remove barriers to minority home ownership. Many low-income borrowers don't have the financial resources to pay the cost of a loan, and the C of the Consumer Financial Protection Bureau has defined lender credits to consumers as a tradeoff. You can make a decision as to— Lender credit, just so I can get my simple mind around it, sort of the opposite of like when I got my mortgage, there was something called points, and points allowed me to buy down the interest rate. Lender credits allow me to agree in advance for a higher interest rate in return for some cash up front, basically? They're somewhat different. Points can be—a borrower can pay points to buy down the interest rate of a loan, or they can pay a point to the lender in connection with the loan. Lender credits are somewhat different. It doesn't change the loan amount. It provides that if the borrower agrees, wants to, have the lender pay for their closing costs, the lender can pay for their closing costs by the borrower accepting a higher rate of interest. It's standard in the industry. Wells Fargo calls it credit for interest rate chosen, but it's standard in the industry. But in either respect, it's the choice of the borrower. It's the choice of the borrower. Got it. And the HUD has found this to be perfectly acceptable. The CFPB recognizes it as an important provision in lending, and also the CFPB has said you can't compare—if you're going to compare borrowers, you can't compare borrowers with one of them having a lender credit and the other not having a lender credit because the interest rate of the borrower who had a lender credit will appear to be artificially high. We cite that at pages 30 and 31 of the briefing for the court. And you can't—what Mr. Peck has talked about is that somehow experts can re-engineer the circumstances to make borrowers' comparators similarly situated. Obviously, as you said, Judge Newsom, that didn't happen in the Lewis case. I've never known that to happen in any case. You can't re-engineer comparators if they either are similarly situated or they aren't similarly situated. They aren't the inquiry ends. And, I mean, I don't know of any case where anyone has even tried to say they could re-engineer it, but if you consider it in the employment context, if a borrower is rejected for a job and they claim they were rejected for discriminatory reasons and the response is that the borrower rejected had lower level of education than the borrower who was hired, you don't re-engineer it to say, well, what if the borrower had similar levels of education? What would the decision—what would the result be? I mean, the thing I worry about a bit is that if we're going to require further evidence to demonstrate that comparators either are or are not similarly situated in all material respects, then summary judgment just goes poof. You'll never have summary judgment in one of these comparator cases again because the parties, whether there's expert testimony in the case or not, they'll always just say, like, oh, whoa, whoa, whoa, we dispute that these people are similarly situated. That's right. That's right. And you, in the Lewis case, as you said before, you made that determination. Somebody could argue that you could make them similarly situated, but the court applies that. It's an element of the prima facie case that the plaintiff must satisfy. If they don't satisfy it, the case ends. And particularly the Consumer Financial Protection Bureau has said that loan pricing is inherently complex. That's cited in our response to the motion for summary judgment. It's inherently complex. And you cautioned in the Lewis decision, as a panel of this court did previously in the Boykins decision, that you can't try to second-guess business decisions. You can't try to recreate a pricing decision and see what it should have been in some hypothetical situation. And this is, as you said in Lewis, the concept of comparators is to describe a winner. What's a winner? You don't have a winner in these kind of circumstances. You have hypothetical situations. You have what ifs. That's not a winner. In a loan situation, though, as you just said, this is a complex industry. And as Judge Newsom has talked about, that if every borrower gets sort of a different menu of options and can choose from that, I almost think this would be near impossible to find comparators because every borrower is going to have different choices. And those choices made by the borrower are going to affect the loan in very different ways. Yes, Judge Branch, in some circumstances it may be difficult. But this is just one of the ways. There's a variety of ways. This was an effort to prove intentional discrimination. And I say they didn't present any evidence on disparate impact. They didn't even identify a policy that was subject to the disparate impact approach. But here they chose to, again, if you were talking about intentional discrimination, if you read their complaint, you would think they would be presenting direct evidence of discrimination. They have some 17 paragraphs of the complaint from paragraph 21 to 38 talk about the damning evidence that's going to come from former employees of Wells Fargo with direct evidence of intentional discrimination. That didn't materialize. The only evidence they presented was one very weak affidavit, a declaration from a former employee who said that if he had been shown evidence of discrimination, he would agree that it's consistent with the city's theory of escape. That doesn't move the ball one inch in establishing intentional discrimination. The design of this, as you noted in Lewis, is that the comparators are supposed to be a winner. They're supposed to, and the idea is that they have to raise an inference that a reasonable jury could find in the favor of the plaintiff that it's not only discrimination, not just the difference, but it's discrimination. And not only discrimination, but intentional discrimination. So how in the world with what they've done here can you have any interest of intentional discrimination? And finally, I mean, even the method of selecting the comparators here was flawed from the beginning. And Dr. Ayers admitted in his final rebuttal report that his charge was just to find situations where the minority had a higher loan price and to ignore situations where the minority had a more favorable price. And the evidence, Dr. Ayers said, cut in both directions. In some situations under the very basic method that he used to compare borrowers, in some situations some borrowers, a minority borrower might have had a higher price, in other situations the same method would show that the minority borrower had a more favorable price. So it's flawed in respects that go beyond what you dealt with in the Lewis case. So if there's no further questions, I'll sit down. Thank you. Mr. Peck, you've saved five minutes. Thank you, Your Honor. I want to return first to the fact that in Wells Fargo's motion, they indicate that the whole reason for bifurcating discovery was to focus solely on the statute of limitations question. The scheduling order, docket 61 that the judge produced, talked about only summary judgment with respect to the statute of limitations. And in fact, in his omnibus order, docket number 221, he indicated that he would refuse to entertain any evidence about anything that had to do with loans that were previously made that are outside the limitations period, which is why we could not put in evidence like Exhibit A, because the judge wanted only to hear about evidence within the limitations period and injuries that occur from those specific loans. Your response to the motion for summary judgment, though, acknowledged that you had to establish an injury and you had to prove it. And we said that what we would need to do that was the evidence that had been denied us. We maintained that position throughout because Wells Fargo, despite what my friend just told you, keeps a worldwide database of all the loans and foreclosures and issues with every single one of their loans. It was that database, which Mary Kay Woodward, their representative, testified in the deposition that we were seeking access to and that we never received. But that would allow us to make the connections that we're only making on the basis of publicly available data, which doesn't always allow you to connect a borrower to the specific property and the race and all the information that you need. But using that public data, we did show that there are issues, that there's imminence, and that Exhibit A is a demonstration of what we could have put in if we were permitted to do so, which the judge did not allow. Now, my friend also talked about who our expert attempted to re-engineer. Well, this is not like a Title VII case involving individuals where you have objective information about their level of education, their years of experience or something like that. This is an economic model that has to be used and that our expert is an economist and a law professor and who was the expert used by the Department of Justice in their action on similar kinds of issues, explained that it is very simple to do that and that the regression models that he was putting together, which helped him identify, not cherry pick, but identify the kinds of loans that would be part of any kind of continuing violation regression analysis, were appropriate for that purpose and that, indeed, the lender credits, which we're supposed to simply take their word that this explains everything because they provide no data on, simply does not explain the difference in price between the minority borrowers and others. Now, do you dispute, just so I'm clear, his explanation to me of how lender credits basically work? You're sort of acknowledging or you're sort of accepting a higher rate in return for some help up front? That's generally how it works. That just doesn't sound like rocket science to me. Again, if you're offering the lender credits on a different basis based on race, if you're offering the lender credits and they don't fully explain the differences in prices, then it doesn't matter if that's the explanation. And so that's part of the problem. Now, you asked the question whether summary judgment would ever be available. Well, you know, again, if you're looking at an economic issue, as we are here, as opposed to objective criteria, then if an expert does put in evidence and there is a competing views of experts, then that is something that is properly going to go to the jury. So is that how we kind of draw the sort of the line around this is that you say in a title seven cases, they're easy. So like, so what if the parties say, oh, wait, wait, I actually think there's a factual dispute about whether these two people are valid comparators. We sort of ignore that. But because this is like complicated economics and there's an expert report in the record, their summary judgment is not going to happen. I believe so, because what you have here is the joining of the factual issue by the presentation of data. And that presentation of data makes all the difference because that's the kind of analysis that this bank uses and bakes into whether they give you that mortgage in the first place. Yeah, I guess the reason that sort of leaves me a little cold is that that that feels sort of like viscerally understandable, but I'm not really sure that there's like an analytical basis for distinguishing the like easy title seven case on the one hand, but where the parties care desperately about that. And here's why. And, you know, they think there is genuinely a factual dispute about the valid comparison between these people. And because this is like a big bank and mortgages and it's hard and we've got experts, that's different. This really that feels OK, but analytically, I'm not really sure there's any difference. And here's the reason why I think there's a difference, at least in this instance. A doctor airs who whose analysis was mischaracterized and his concessions were mischaracterized by my friend, but showed his homework. He showed the math. He showed how he got there. Their expert, Dr. Siskind, didn't. He simply said, well, their lender credits. And that explains everything. That to me makes it clear that there is a jury issue because, again, we put in real evidence and they've just opined about it. OK, we understand your case. We're adjourned for the week. Thank you, Mr. Pack. Thank you.